Jones v. Basoukas                     CV-95-160-JD  02/03/97
            UNITED STATES DISTRICT COURT FOR THE
                  DISTRICT OF NEW HAMPSHIRE

William H. Jones, Jr.

     v.                              Civil No. 95-160-JD

Darren Basoukas, et al.

                        O R D E R


     The pro se plaintiff, William H. Jones, Jr., brings this

action under 42 U.S.C. § 1983 against the current defendants,

Warden Michael Cunningham, Corporal Stephen Nolan, and Corporal

Frank Cassidy of the New Hampshire State Prison.  The plaintiff

alleges his civil rights were violated on two separate occasions

during his incarceration, the first in 1992 subsequent to a

prison disturbance when the plaintiff was subjected to a visual

body cavity search, and the second in 1994 when he was denied

medical treatment and a medically recommended diet at Calumet

House, a Department of Corrections halfway house.  Before the

court is the defendants' motion for summary judgment (document

no. 56).

                       Background[1]

     The plaintiff was incarcerated at the New Hampshire State

Prison in the close custody unit ("CCU") in August 1992.  On the

night of August 29, 1992, or the morning of August 30, 1992, an

_____

     [1]The facts relevant to the instant motion are either not in
dispute or have been alleged by the plaintiff.

inmate disturbance began in the CCU.  The disturbance resulted in vandalism and destruction by inmates, including the lighting of fires.  As a result of the disturbance, a Special Emergency Response Team ("SERT"), of which defendant Cassidy was a member, was called in to search cells and inmates for weapons and contraband on the morning of August 30, 1992.  Defendant Cassidy had no authority to determine who was on the SERT or who would participate in the searches of the CCU.

The attempt to reestablish order included the visual body cavity search of the defendant and other inmates.[2]  The SERT searched the plaintiff at approximately 11:30 a.m. on August 30, after the prisoners had been locked in their cells following the disturbance.  A videotape taken at the time of the search indicates that the CCU still showed signs of the disturbance, with what appears to be fecal matter smeared on the wall and various liquid and solid refuse strewn about the floor.  The plaintiff asserts that the search, which lasted approximately six minutes, was conducted in a humiliating fashion in the presence

---

[2]The court uses the term "visual body cavity search" to describe the challenged search rather than the more general term "strip search" used by the parties because a videotape of the search indicates that the prisoners were required not only to remove all clothing but also to present their oral, anal, and genital areas for visual inspection.  See Cookish v. Powell, 945 F.2d 441, 444 & n.5 (1st Cir. 1991).

2

of female corrections officers and that he, an African-American, was treated differently than white inmates.

The plaintiff's remaining claims stem from his stay at Calumet House, a Department of Corrections halfway house. The plaintiff suffers from diabetes, which was diagnosed in 1992. As a result, doctors have prescribed twice-daily self-administered insulin injections and a special medical diet. The insulin and hypodermic needles necessary for the injection procedure are controlled substances in the corrections environment, and therefore were secured by corrections staff and dispensed to the plaintiff as he required them.

On May 18, 1994, the plaintiff was transferred to Calumet House. He was kept as a minimum custody inmate until May 23, 1994, when he obtained work-release status. On that day, the plaintiff secured, through a temporary agency, a job scheduled to begin on May 24, 1994. Because the plaintiff's job required him to be away from Calumet House at the time he was scheduled to receive one of his daily injections, it was necessary for him to check out his insulin and needle when he signed out of the house.

Defendant Nolan was the officer in charge at Calumet House on May 24, 1994. The plaintiff left for work at around 12:30 p.m. that day and asked an unidentified corrections officer for insulin and a needle when he signed out. The unidentified

3

officer denied his request.  The plaintiff also asked to talk to the prison doctor about his medical condition and gave the unidentified officer two inmate request slips addressed to the doctor but never received a response from the doctor.  Defendant Nolan was not the unidentified officer, was not made aware of the plaintiff's request for insulin, did not receive an inmate request slip regarding the plaintiff's insulin or diabetes, did not intercept or impede any communication from the plaintiff to anyone, and did not deny the plaintiff insulin or a needle on May 24, 1994, or any other day.[3]  In addition to his claims concerning May 24, 1994, the plaintiff also asserts that he was denied his specially prescribed medical diet throughout his stay at Calumet House.  The formulation of special medical diets is a service under the control of the Department of Corrections dietician, but no dietician was assigned to Calumet House.

The plaintiff commenced this action on March 30, 1995.  The plaintiff's action currently consists of the following claims:

---

[3]The plaintiff has asserted "that Corporal Nolan was the officer of responsibility for making sure that plaintiff received his needle and insulin and by not going through the proper procedure to insure that this plaintiff did receive his medication, did deprive plaintiff of his constitutional rights." Plaintiff's Objection to Defendants' Motion for Summary Judgment ¶ 1.  This statement does not contradict defendant Nolan's explicit assertion that he had no personal knowledge of or involvement in any of the events surrounding the plaintiff's sign-out.

4

in counts two and three, the plaintiff alleges that defendant Cassidy violated his rights to equal protection, to privacy, and against unreasonable searches by subjecting him to a humiliating visual body cavity search in the presence of female corrections officers when his white cellmate was not subjected to the same treatment; in count one, the plaintiff alleges that defendant Nolan denied him adequate medical care in violation of the Eighth Amendment by denying him access to insulin and a needle and by interrupting communication with the prison doctor on his first day of work; and in count four, the plaintiff alleges that defendant Cunningham denied him adequate medical care by depriving him of his medically prescribed diet during his stay at Calumet House. The defendants have moved for summary judgment as to all claims.

## Discussion

The role of summary judgment is "to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required." Snow v. Harnischfeger Corp., 12 F.3d 1154, 1157 (1st Cir. 1993) (quoting Wynne v. Tufts Univ. Sch. of Medicine, 976 F.2d 791, 794 (1st Cir. 1992)). The court may only grant a motion for summary judgment where the "pleadings, depositions, answers to

5

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The parties seeking summary judgment bear the initial burden of establishing the lack of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Quintero de Quintero v. Aponte-Roque, 974 F.2d 226, 227-28 (1st Cir. 1992). The court must view the entire record in the light most favorable to the plaintiff, "'indulging all reasonable inferences in that party's favor.'" Mesnick v. General Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991) (quoting Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990)). However, once the defendants have submitted a properly supported motion for summary judgment, the plaintiff "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986) (citing Fed. R. Civ. P. 56(e)). The plaintiff bears this burden even where, as here, he appears before the court pro se. United States v. Michaud, 925 F.2d 37, 41 (1st Cir. 1991).

6

1.  <u>The August 1992 Visual Body Cavity Search</u>

In counts two and three, the plaintiff asserts that defendant Cassidy, as part of the SERT that conducted the visual body cavity search of him on August 30, 1992, violated his rights in at least three respects. First, he claims that he, an African-American, was treated differently than his white cellmate in the search. Second, he asserts that he was denied his right to privacy because female prison guards were present during the search. Third, he contends that the search violated his right to be free from unreasonable searches because female prison guards were present during the search. Defendant Cassidy, whom the plaintiff asserts is responsible for these alleged violations, has submitted a videotape of the search and, based on this videotape, contests the plaintiff's factual allegations and legal conclusions. Defendant Cassidy further claims, <u>inter alia</u>, that even if the plaintiff's factual allegations are true, he is entitled to qualified immunity from claims arising from his actions.

The videotape portrays some of the relevant events of August 30, 1992, as the SERT attempted to reestablish the security of the prison, including the visual body cavity search of the plaintiff and other inmates. It satisfies the defendants' burden of showing that there is no genuine issue of material fact for

7

trial as to the issue of the alleged disparate treatment of the plaintiff. Although the plaintiff claims that he can use the tape to show he was treated differently than his white cellmate and that he was humiliated and degraded in front of female officers by being forced to turn around more than once, these claims are belied by the tape.[4] The guards' treatment of the plaintiff during the six-minute search was not substantially different than their treatment of any other inmate portrayed in the tape, African-American or white. The plaintiff's conclusory allegations do not raise any reasonable inference that he was treated differently than white inmates and the court finds that the plaintiff has failed to raise a genuine issue of material fact with respect to this issue.

As to the plaintiff's claims that the search violated his rights to privacy and against unreasonable searches by the presence of female guards, the court notes that the videotape

---

[4]Because the camera was focused on the plaintiff during the search, the tape does not depict the search of his cellmate, which took place at the same time. Thus, the plaintiff cannot use the tape to demonstrate that he was treated differently than his cellmate. However, the tape does show all or part of the searches of several other inmates, both African-American and white. While the plaintiff was required to turn around twice and there is a basic level of invasiveness associated with any body cavity search, see Cookish, 945 F.2d at 446, the videotape indicates that the search of the plaintiff was substantially similar to that of other prisoners and that the plaintiff was not singled out for humiliating treatment.

8

does not resolve definitively the disputed factual issue of the presence or absence of female guards at the visual body cavity search. Although none of the guards shown in the tape are identifiable as female, the tape does not make it possible to identify the gender of all the guards present at the search. Accordingly, the court assumes, as the plaintiff has alleged, that female guards were present at the search.

Some courts have determined as a matter of law that the presence of female officers at the challenged search or searches of male prisoners did not violate the prisoners' right to privacy. See Jones v. Harrison, 864 F. Supp. 166, 168-69 (D. Kan. 1994); Rodriquez v. Kincheloe, 763 F. Supp. 463, 470-71 (E.D. Wash. 1991), aff'd, 967 F.2d 590 (9th Cir. 1992); Merritt-Bey v. Salts, 747 F. Supp. 536, 539 (E.D. Mo. 1990), aff'd, 938 F.2d 187 (8th Cir. 1991); see also Canedy v. Boardman, 91 F.3d 30, 34 (7th Cir. 1996) (jury found that periodic strip searches of plaintiff did not violate his right to privacy ); Thompson v. Wyandotte County Detention, 869 F. Supp. 893 (D. Kan. 1994) (summary judgment awarded against female prisoner as to irregular and isolated occasions on which she was allegedly viewed in the nude by male guards). The First Circuit has noted that the reasonableness of a search in these circumstances depends, in part, on whether or not a state of emergency existed at the time

9

of the search.  See Cookish v. Powell, 945 F.2d 441, 446, 448 (1st Cir. 1991).  Defendant Cassidy asserts that the search was conducted in an emergency situation.  The plaintiff claims that the search was not conducted pursuant to an emergency because the unit had been locked down since the previous evening, and thus the emergency situation that existed during the disturbance had ended.

In Cookish, the First Circuit noted that the duration of an emergency is difficult to determine.  See id. at 448.  The court noted:

> At what point an emergency has ended, rather than capable of pinpoint reference, is more likely determined by placement somewhere on a continuum of time.  Here, the facts are that the inmates' riotous behavior had ended as a result of the defendants' show of force and this search was conducted as part of a transfer of inmates in response to their riotous behavior in order to ensure that the inmates were not carrying weapons, matches, combustibles or other contraband, which could cause a resumption of the disturbance.  Unquestionably, there would be some point at the extreme end of this continuum of time at which a prison official could not reasonably believe that his conduct was occurring during the course of an emergency.  We need not explore this outer reach, however, for we can confidently conclude that the defendants' judgment in this case about their conduct in the immediate aftermath of this riot (that is, even if a trier of fact were to find that the emergency, in fact, had ended) fell comfortably within this spectrum.

Id. at 448-49 (citation omitted).  The court went on to hold that under the circumstances, the defendant prison guards were

entitled to qualified immunity even if they were mistaken about the existence of an emergency situation at the time of the search. See id. at 449.

A government official exercising discretionary authority is entitled to qualified immunity in respect to § 1983 claims only if his or her conduct does not violate "clearly established" statutory or constitutional rights. See Quintero de Quintero, 974 F.2d at 928 (citing Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). To be "clearly established," the contours of the right must be sufficiently clear so that a reasonable official would understand what he is doing violates that right. See id. (citing Anderson v. Creighton, 483 U.S. 635, 640 (1987)). When deciding if a defendant is entitled to qualified immunity, the court does not consider whether that defendant actually violated a plaintiff's constitutional rights. The court focuses only on whether the defendant's behavior was "objectively reasonable, as a matter of federal law," at the time and under the circumstances of the action at issue. See id.; see also Amsden v. Moran, 904 F.2d 748, 751 (1st Cir. 1990).[5] "Because qualified immunity does

---

[5]The objective legal reasonableness standard eliminates from the court's consideration allegations about the government official's subjective state of mind, such as bad faith or malicious intent. Floyd v. Farrell, 765 F.2d 1, 4 (1st Cir. 1985). Thus, a plaintiff's allegation of a defendant's "ulterior motive" in performing the challenged act is not relevant to the

11

not address the substantive viability of a section 1983 claim, but rather the objective reasonableness of a defendant's actions, a plaintiff who is entitled to prevail on the merits is not necessarily entitled to prevail on the issue of qualified immunity." Collins v. Marina-Martinez, 894 F.2d 474, 478 (1st Cir. 1990). When a defendant moves for summary judgment on the basis of qualified immunity, it is the plaintiff's burden to demonstrate that the defendant infringed a "clearly established" federal right. See Quintero de Quintero, 974 F.2d at 228; Castro-Aponte v. Ligia-Rubero, 953 F.2d 1429, 1430 (1st Cir. 1990). If the plaintiff fails to do so, the defendant prevails. See Quintero de Quintero, 974 F.2d at 228; Castro-Aponte, 953 F.2d at 1431.

Here, as in Cookish, the parties agree that there had been a disturbance but disagree about whether or not the emergency still existed at the time of the search. However, in the circumstances, a reasonable person in defendant Cassidy's position would not have known that his conduct violated any

---

court's decision of whether the qualified immunity defense is applicable. In addition, the objective legal reasonableness of the government official's conduct is not measured against the defendant's actual knowledge of the constitutional standards and the probable constitutionality of his or her action, but rather against a relatively uniform level of "presumptive knowledge" of constitutional standards. Floyd, 765 F.2d at 4-5.

clearly established right of the plaintiff. See Cookish, 945 F.2d at 447-48. Defendant Cassidy's participation in the effort to secure the prison by searching the prisoners for contraband after the disturbance falls within that spectrum on the continuum of time during which a reasonable prison officer would not know that the emergency had ended and thus not know that his or her conduct violated the clearly established rights of the plaintiff. See id. Thus, the court finds that even if female guards were present during the search of the plaintiff and even if the search was not conducted during an actual emergency situation, given the conditions present at the time of the search defendant Cassidy is entitled to qualified immunity as to the plaintiff's claims that the search violated his rights to privacy and against unreasonable searches. See id. at 449. Therefore, the court grants summary judgment in favor of defendant Cassidy on counts two and three.

2. Denial of Medical Treatment

In count one of his redrafted complaint, the plaintiff alleges that defendant Nolan, as the "officer in charge" at Calumet House on May 24, 1994, the plaintiff's first day of work, was deliberately indifferent to the plaintiff's medical needs due to an unidentified staff member's failure to provide him with

13

insulin and a hypodermic needle when he checked out.  He also alleges that defendant Nolan is responsible for the unidentified staff member's acts preventing the plaintiff from contacting prison doctors and the medical staff at the prison concerning his diabetes.  Defendant Nolan denies any personal knowledge or involvement with such activity.

The court notes that it has previously granted summary judgment to defendant corrections officer Darren Basoukas as to his role in the conduct challenged in count one.  The court subsequently allowed the plaintiff to substitute Officer Nolan as a defendant in count one, asserting against defendant Nolan the same claims the plaintiff had previously made against defendant Basoukas.  However, the plaintiff's amendment added defendant Nolan only as "the officer of responsibility" in charge at Calumet House on the day of the incident.  The plaintiff has not alleged that he had any personal contact with defendant Nolan on the date in question, and it appears that the plaintiff continues to contend that defendant Basoukas or another unidentified officer is the person who actually denied him insulin and a needle.  Thus, the court understands the plaintiff's allegations against defendant Nolan to rest either on a theory of respondeat superior or of supervisory liability.  In either case, his claim is unavailing.

14

It is well established that respondeat superior "will not attach under § 1983." <u>City of Canton v. Harris</u>, 489 U.S. 378, 385 (1989). Furthermore, "supervisory officials may be found liable only on the basis of their own acts or omissions," <u>Miranda v. Munoz</u>, 770 F.2d 255, 260 (1st Cir. 1985), and will be liable for the street-level misconduct of their employees only if, through their own acts or omissions, they are deliberately indifferent to the risk of harm to the plaintiff and this indifference leads "inexorably to the constitutional violation," <u>Hegarty v. Somerset County</u>, 53 F.3d 1367, 1380 (1st Cir.), <u>cert. denied</u>, 116 S. Ct. 675 (1995). <u>See also</u> <u>Horan v. City of Laconia</u>, No. 95-519-JD, slip op. at 9 (D.N.H. June 11, 1996); <u>Raineri v. Hillsborough County Dep't of Corrections</u>, No. 93-118-JD, slip op. at 16 (D.N.H. Jan. 9, 1996). Defendant Nolan's uncontroverted assertion that he had no personal knowledge of or involvement in the failure of an unidentified staff member to issue the plaintiff insulin and a needle on May 24, 1994, satisfies his burden of demonstrating that no genuine issue of material fact exists as to his alleged deliberate indifference to the plaintiff's medical need. In his response, the plaintiff has failed to produce any evidence to demonstrate that defendant Nolan had personal knowledge of or acted with deliberate indifference to the fact that plaintiff's medical

15

needs were being ignored by unidentified members of the Calumet House staff. He also has failed to allege with specificity what other acts or omissions by defendant Nolan caused the deprivation and has failed to establish any causal link between defendant Nolan's acts and the deprivation. The plaintiff's conclusory allegations that defendant Nolan is liable as the "officer of responsibility" are insufficient to raise a genuine issue of material fact for trial. Therefore, the court grants summary judgment in favor of defendant Nolan on count one.

3. Failure to Provide Special Medical Diet

In count four of his redrafted complaint, the plaintiff alleges that defendant Cunningham violated his Eighth Amendment rights by failing to provide him with a special medical diet while he was housed at Calumet House. The plaintiff asserts that although defendant Cunningham normally has no responsibility for the provision of medical meals, in this case there was no dietician assigned to Calumet House and therefore defendant Cunningham is liable as the overseer of all prison functions. Because the plaintiff has not alleged that defendant Cunningham was personally involved in the deprivation, the court interprets the plaintiff's claim to be based on a theory of supervisory liability.

16

As the court has noted supra, supervisory officials are liable for the misconduct of their employees only if their own acts or omissions demonstrate a deliberate indifference to the plaintiff's rights which leads directly to the harm the plaintiff suffered. Therefore, because no dietician was assigned to Calumet House, defendant Cunningham can only be held liable in his supervisory capacity for the plaintiff's nonreceipt of a special medical diet if, in failing to provide a dietician or see to it that the plaintiff otherwise received his prescribed meal, his omission amounted to deliberate indifference to the plaintiff's medical needs. However, the plaintiff has not asserted that he made any member of the Calumet House staff aware of his need for a special medical diet or complained about their failure to provide it to him. In addition, he has failed to produce any evidence indicating that defendant Cunningham was aware either that the plaintiff required a special medical diet or that he was being deprived of that diet. Finally, the plaintiff has not shown any link between defendant Cunningham's alleged indifference and the plaintiff's non-receipt of medical meals. Under the circumstances, even assuming that the supervisory structure of the corrections system is such that defendant Cunningham is ultimately responsible for the lack of a dietician at Calumet House, the plaintiff has not produced any

17

evidence to raise a reasonable inference that defendant Cunningham was deliberately indifferent to his need for special meals. Accordingly, the court grants summary judgment to defendant Cunningham on count four.

## Conclusion

For the reasons stated above, the defendants' motion for summary judgment (document no. 56) is granted. The clerk is ordered to close the case.

SO ORDERED.

_____
Joseph A. DiClerico, Jr.
Chief Judge

February 3, 1997

cc: William H. Jones, Jr.
Martin P. Honigberg, Esquire